MICHAEL B. MURPHY (State Bar No. 123849)
mbm@severson.com
ELIZABETH L. DOLTER (State Bar No. 128457)
eld@severson.com
ERYK R. GETTELL (State Bar No. 245245)
erg@severson.com
SEVERSON & WERSON
A Professional Corporation
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Plaintiff
NORTH AMERICAN CAPACITY
INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NORTH AMERICAN CAPACITY INSURANCE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE M. TYNDALL,<br><br>Defendants. | Case No. 2:23-cv-02975<br><br>**COMPLAINT** |

Plaintiff, North American Capacity Insurance Company ("NACIC"), for its Complaint against Defendants University of Southern California ("USC") and Dr. George M. Tyndall ("Dr. Tyndall") (collectively, "Defendants"), alleges as follows:

## I.   NATURE OF THE ACTION

1.      This is an insurance coverage action whereby NACIC seeks declaratory relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 in connection with claims tendered by Defendants regarding hundreds of sexual abuse-based lawsuits brought against the Defendants for which NACIC made

indemnity and defense payments under a reservation of rights. In the alternative, NACIC seeks rescission of the policy it issued to Defendants.

2. NACIC issued an excess healthcare professional liability policy, policy number HRM 1000010-01 for the policy period July 1, 2017 to July 1, 2018 (the "NACIC Policy," a true and correct copy of which, with premium redacted, is attached as Exhibit A) to USC. Except as it otherwise specifies, the NACIC Policy follows form to the BETA Risk Management Authority ("BETARMA) Contract issued for the same policy period under policy number HCL 17-807 (the "BETARMA Policy", a true and correct copy of which is attached as Exhibit B). The NACIC Policy's $20 million in indemnity coverage is excess of $40 million in underlying coverage provided by the BETARMA Policy ($20 million per claim/$30 million aggregate) and a policy issued by National Fire & Marine Insurance Company ($20 million per claim and in the aggregate) (National Fire & Marine Insurance Company is also known and hereinafter referred to as "MedPro").

3. NACIC seeks a determination of the parties' rights and obligations under the NACIC Policy and the BETARMA Policy through the NACIC Policy's Follow Form language. These policies bar or limit coverage for claims asserted against USC, the Board of Trustees of USC (the "Trustees"), and Dr. Tyndall.

4. It is well-documented that USC and its employees and administration had knowledge of facts or circumstances that would cause a reasonable person to believe a claim might be made. Knowledge of Dr. Tyndall's inappropriate conduct toward patients began accumulating at least as early as 1990, continuously developed over many years, and preceded USC's request for NACIC to issue the NACIC Policy and the inception of the NACIC Policy. The facts demonstrate that both the NACIC Policy and the BETARMA Policy bar coverage for these claims under numerous grounds.

## II.    PARTIES

5. NACIC is an insurance company formed under the laws of the State of

1   New Hampshire and has its principal place of business in Kansas City, Missouri.

2       6.      Defendant USC is a corporation formed under the laws of California with

3   its principal place of business in Los Angeles, California.

4       7.      Dr. Tyndall is an individual who is a citizen of the State of California.

5   **III.    JURISDICTION AND VENUE**

6       8.      This dispute is between citizens of different states and complete diversity

7   exists.

8       9.      This dispute concerns an insurance policy with a $20 million indemnity

9   limit of liability, plus defense costs, for the policy period at issue and the amount in

10  controversy exceeds $75,000, exclusive of interest and costs.

11      10.     As a result, this Court has subject matter jurisdiction pursuant to 28

12  U.S.C. § 1332(a).

13      11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because

14  the Defendants reside within the boundaries of the Central District of California and

15  a substantial part of the events giving rise to this action occurred within the Central

16  District of California.

17  **IV.    FACTUAL BACKGROUND**

18      **A.      Preliminary Allegations Regarding Dr. Tyndall**

19      12.     USC employed Dr. Tyndall from 1989 through June 30, 2017, primarily

20  as a gynecologist in USC's Student Health Center.

21      13.     During the period of his employment, numerous students and USC

22  Student Health Center staff reported concerns about Dr. Tyndall's clinical practices

23  including the use of a camera during pelvic exams, prohibiting assistants or

24  chaperones behind the curtain during exams, inappropriate exams, inappropriate

25  touching, inappropriate comments or remarks, locking the doors, and unnecessary

26  repeat visits.  These reports were made to USC Student Health Center staff, leadership

27  and administration.

28      14.     In Spring 2013, following the reports of chaperones, nurses and medical

assistants concerning the inappropriate conduct, a nursing supervisor reported them to Executive Director of the Student Health Center.  The Executive Director referred the complaints raised to USC's Office of Equity and Diversity ("OED") which initiated an investigation.  Shockingly, Dr. Tyndall remained employed due to the fact the OED's investigation concluded he "had not violated any USC policies".

15.    In May 2016, nursing supervisor Cindy Gilbert formally reported her concerns over Dr. Tyndall's recurring inappropriate behavior.  This time she also reported it to the Executive Director of USC's Relationship and Sexual Violence and Prevention Services, which in turn reported it to USC's OED.  This led to the opening of a new OED investigation.

16.    The OED conducted further interviews on June 15, 2016 with other nurses and medical assistants from the Student Health Center who were present during Dr. Tyndall's patient examinations.  These witnesses alleged that Dr. Tyndall frequently made inappropriate comments during examinations that upset patients and resulted in patient complaints, that Dr. Tyndall commonly inserted one or two fingers into the patient's vaginal opening before inserting the speculum, that Dr. Tyndall conducted full body checks which he did not report in the patient's chart, and that Dr. Tyndall did not practice proper hygiene.  They also expressed concern about Dr. Tyndall's practices with respect to advising patients about performing breast examinations.

17.    A search of Dr. Tyndall's office on June 16, 2016 uncovered significant numbers of photographs and slides of patient's genitalia.  A number of these photos included patients' personally identifying information.

18.    On or about June 17, 2016, USC placed Dr. Tyndall on paid administrative leave.

19.    In May 2017, following another internal investigation, USC notified Dr. Tyndall that it would be terminating his employment.

20.    On June 30, 2017, Dr. Tyndall's employment ended pursuant to a

4

COMPLAINT

severance agreement entered into with USC.

21.    Even though the NACIC policy was to incept on July 1, 2017, USC never communicated, notified, disclosed, or informed NACIC about the reports, investigations, findings, Dr. Tyndall's administrative leave, or Dr. Tyndall's termination.

22.    The day after the effective date of Dr. Tyndall's contractual severance, the NACIC Policy went into effect for the term starting on July 1, 2017 to July 1, 2018.

23.    In February 2018 the *Los Angeles Times* began investigating the allegations concerning USC and Dr. Tyndall after receiving an anonymous tip, and prepared to publish an article concerning the allegations against USC and Dr. Tyndall.

24.    On or before May 8, 2018, USC learned that the *Los Angeles Times* planned to publish that article.  USC issued its first public statements concerning Dr. Tyndall on May 15, 2018, one day before the *Los Angeles Times* published the article concerning Dr. Tyndall.

25.    In a May 15, 2018 public statement, USC acknowledged it had received numerous concerning complaints over 14 years between 2000 and 2014.  "Several of the complaints were concerning enough that it is not clear today why the former health center director permitted Tyndall to remain in his position."[1]  Three days later, the then-USC President wrote to the USC Community that Dr. Tyndall "should have been removed and referred to authorities years ago."[2]

26.    Within a week of USC's first public statement and the *Los Angeles Times* article, former patients began filing lawsuits in California state and federal courts

_____

[1]    *See* Statement of Facts, May 15, 2018, available at https://pressroom.usc.edu/statement-of-facts-may-15-2018/ .

[2]    *See* Letter from President Nikias to the USC Community, May 18, 2018, available at https://pressroom.usc.edu/letter-from-president-nikias-to-the-usc-community-may-18-2018/ .

against both Dr. Tyndall and USC.  USC tendered the lawsuits to BETARMA and the excess insurers of the BETARMA Policy, demanding coverage for the lawsuits.

### B.    The Underlying Lawsuits

27.    The former student-patients filed numerous lawsuits against USC and Dr. Tyndall in this Court and in the Superior Court for the County of Los Angeles. Some of the lawsuits named USC's Trustees as defendants.  The lawsuits included both individual claims and class actions.

28.    The federal lawsuits filed as putative class actions were consolidated as *In re: USC Student Health Center Litigation,* No. 2:18-cv-04258 (the "Federal Class Action").  A true and correct copy of the Second Amended Complaint in the Federal Class Action is attached as Exhibit C.

29.    The California state court lawsuits filed in the Superior Court of Los Angeles County included both individual claims as well as class actions.  They were consolidated for discovery purposes (the "State Cases").  A true and correct copy of the Master Complaint in the State Cases is attached as Exhibit D.

30.    The Federal Class Action and State Cases contained numerous theories of recovery against USC and/or Dr. Tyndall including, but not limited to, sexual assault, sexual battery, sexual harassment, negligence, intentional inflection of emotional distress, invasion of privacy, fraud, and other torts, and statutory violations.

31.    The Federal Class Action and State Cases generally sought damages for physical and emotional injuries, pain and suffering, fear, embarrassment, humiliation, medical expenses, lost wages, lost earning capacity, statutory damages, punitive and exemplary damages, attorneys' fees, costs, interest and restitution.  Additionally, many sought declaratory, equitable and injunctive relief.

#### i.    The Federal Class Action

32.    The Federal Class Action generally alleged that Dr. Tyndall engaged in sexual abuse, harassment, molestation, unwanted touching, and invasion of privacy of patients that was well-outside the standard of care and under the guise of rendering

medical treatment.

33.    The Federal Class Action generally alleged that USC and the Trustees failed to adequately supervise Dr. Tyndall, knew of the misconduct, failed to take any action to stop or discipline him, and further concealed that information, allowing Dr. Tyndall to continue working at USC.

34.    USC settled the Federal Class Action in the fall of 2019 subject to approval from the Court.  At that time, the Court had not made any determinations or rulings concerning USC, Dr. Tyndall or the Trustee's liability.

35.    On February 25, 2020, the Court certified and approved a class settlement in the Federal Class Action for $215 million plus up to $25 million in attorney's fees.  The Federal Class Action settlement included tiers of class members with the higher tiers requiring more detailed claim forms.  The Federal Class Action settlement also provided an opt out clause for potential class members.

36.    The minimum class membership qualifications for Tier 1, the base tier, only required the claimant to have been seen for treatment by Dr. Tyndall at the USC Student Health Center for Women's Health issues between August 14, 1989 and June 21, 2016; it did not require the claimant to submit any statement, allegation, documentation or proof of any inappropriate or negligent conduct, injury, or damage—simply having seen Dr. Tyndall for Women's Health Issues qualified the claimant as a class member and entitled the claimant to a Tier 1 award.  Tier 2 and 3 award qualifications required the claimants to submit actual documented accounts.

37.    The Federal Class Action settlement required USC, Dr. Tyndall and the Trustees to deposit $50 million into an escrow account which was "applicable towards costs of administration, including costs associated with the Special Master's Team and Panel, as well as any and all Tier 1 Claim Awards."  *In re Student Health Center Litigation*, 18-cv-04258, Dkt. 167-1, p. 19 (C.D. Cal. Jan. 13, 2020).  The settlement agreement required USC, Dr. Tyndall and the Trustees to deposit the remaining settlement balance into the escrow account "within 10 days after the Special Master

submits her proposed Claim Awards to the Court" for the Tier 2 and Tier 3 claims. *Id.*

38.    The Federal Class Action claims administrator issued 15,006 Tier 1 payments of $2,500, totaling $37,515,000 on April 6, 2020, and continued to distribute payments from July 2020 through March 2021. *In re Student Health Center Litigation,* 18-cv-04258, Dkt. 179-2, p. 10 (C.D. Cal. Mar. 24, 2021). The Federal Class Action claims administrator issued or was in the process of issuing (as of March 24, 2021) a combined total of 16,017 Tier 1 Claim awards over the course of that period, which totaled $40,042,500. *Id.*

39.    Out of the 16,017 Tier 1 claim awards, 1,655 submitted the additional forms for Tier 2 inclusion and 1,321 for Tier 3 inclusion.[3] Following the Panel's review of the claim forms, it confirmed eligibility for 1,606 Tier 2 and 1,319 Tier 3 claim submissions in its March 24, 2021 report. Thus, 81.7% (13,092 out of 16,017) of the claimants received an award solely under Tier 1 without any claim or allegation of misconduct, negligence, injuries or damages. This amounts to $32,730,000 paid to Tier 1 only claimants between April 2020 and March 2021.

40.    The Special Master submitted her proposed claim awards on March 24, 2021, making the settlement balance payment due on April 3, 2021. *In re Student Health Center Litigation,* 18-cv-04258, Dkt. 179-1 (C.D. Cal. Mar. 24, 2021).

41.    Following the Federal Class Action settlement effective date, NACIC paid USC the full limit of indemnity liability under the NACIC Policy subject to a full reservation of its rights including, pursuant to applicable California law , the right to seek reimbursement of the NACIC indemnity limits in full.

42.    USC also submitted claimed defense expense invoices to NACIC for the period March 27, 2020 to May 7, 2020—the time period between when underlying

---

[3]    Two of the Tier 2 Claims were ultimately determined ineligible due to uncured deficiencies in the submitted forms.

healthcare professional liability insurers purportedly exhausted and when NACIC tendered USC its policy limits subject to the full reservation of rights.

43.     In addition to questioning—and reserving its rights to challenge—whether the defense costs were covered, NACIC also contested whether the defense expenses were reasonable and necessary.   NACIC ultimately entered into a confidential settlement agreement with USC whereby it issued a payment for defense expenses in an amount with which USC agrees, subject to NACIC's right to seek full reimbursement if, as NACIC here contends, the Policy does not provide coverage for those defense expenses.

### ii.     The State Cases

44.     The State Cases generally allege Dr. Tyndall sexually abused, molested and harassed female students in the guise of rendering treatment that served no legitimate medical purpose.

45.     The State Cases alleged USC had knowledge of Dr. Tyndall's inappropriate behavior as early as 1988 (even before he started at USC) and actively concealed the student-patient complaints concerning Dr. Tyndall and concerns of nurses and staff about Dr. Tyndall's sexual abuse.

46.     The State Cases sought special damages, non-economic damages, statutory damages, costs of suit, interest, attorney's fees, declaratory and injunctive relief, and potentially punitive damages.

### C.     History of and Investigations into Dr. Tyndall's Inappropriate Conduct

47.     USC hired Dr. Tyndall for its student health center in approximately 1989.  Known complaints concerning Dr. Tyndall's conduct at USC date back to at least 1990.  By way of example, USC's records contain evidence of the following complaints concerning Dr. Tyndall over the years:

a. In 1990, a graduate student submitted a complaint stating Dr. Tyndall provided rude treatment and described the examination as

uncomfortable.  The complainant stated if that had been her first visit as an 18-year-old, she would never return to see a gynecologist.  *In re USC Student Health Center Litigation,* 2:18-cv-04258, Dkt. 143-16, p. 24 (C.D. Cal. May 23, 2019).

b.  During the 1990s, USC's Student Health Center leaders directed Dr. Tyndall to stop bringing a camera into the examination room after healthcare staff raised concerns about the frequency with which he used the camera during pelvic exams. *Id.* at Dkt. 143-14, pp. 11-12.

c.  In 1998, a student-patient survey stated during the gynecological exam the practitioner without any warning examined her anally, which left her almost in tears.  *Id.* at Dkt. 143-2, p. 44.

d.  In 2000, a student-patient wrote to Dr. Tyndall calling his behavior "repulsive," when he told her about his own sexual experiences.  *Id.* at 65.

e.  In 2002, a medical assistant reported that Dr. Tyndall requested that she stand outside the curtain while he examined the patient.  *Id.* at Dkt. 143-3, p. 5.

f.  In September 2003, it was reported again that Dr. Tyndall was not allowing assistants behind the curtain during pelvic exams.  *Id.* at 45.

g.  In December 2003, a student complained Dr. Tyndall's exam hurt and mentioned the medical assistant was moved behind the curtain.  *Id.* at 61.

h.  A January 2004 student feedback comment described Dr. Tyndall as making the student feel uncomfortable and violated.  *Id.* at 67.

i.  In October 2009, a student-patient wrote a letter describing an uncomfortable encounter where Dr. Tyndall commented on her pubic hair.  The student-patient believed other female students had similar experiences.  *Id.* at Dkt. 143-5, at 30.

j.  A student-patient from 2003-2005 reported in April 2010 that Dr. Tyndall performed pelvic treatment without gloves and without a chaperone in the room. *Id.* at Dkt. 143-6, p. 3.

k.  In 2013, a student-patient reported that Dr. Tyndall pressed her to have an unnecessary pap smear and caused her to feel threatened if she refused. *Id.*

l.  In 2016, a student-patient complained that Dr. Tyndall digitally penetrated her during the examination despite her directing him not to do it. *Id.* at Dkt. 143-11, pp. 7-8.

48.  USC began acting on these complaints at least as far back as 2003.  In that year Dr. Leavitt and Dr. Neinstein spoke with Dr. Tyndall about not allowing medical assistants behind the curtains during exams and other concerns raised by student-patients. *Id.* at Dkt. 143-3.

49.  In April 2010, Dr. Neinstein discussed a student-patient's complaint that Dr. Tyndall examined them while not wearing gloves, which Dr. Tyndall denied. *Id.*

50.  In 2013, Dr. Neinstein documented those historical issues and identified additional issues with Dr. Tyndall's practice methods.  Dr. Neinstein noted that a survey of nursing staff demonstrated concerns with things Dr. Tyndall did during women's health visits.  Medical assistants expressed that Dr. Tyndall did not want them talking to students during exams.  Nursing staff and students expressed discomfort that Dr. Tyndall would lock the door during examinations.  Several students refused to see Dr. Tyndall because they were uncomfortable with him. *Id.*

51.  In May 2016 Cindy Gilbert raised continuing concerns with Dr. Tyndall's conduct and behavior, noting that those concerns had been raised over the previous three years. *Id.* at Dkt. 143-10.  She wrote that medical assistants and RNs who work with him continued to raise concerns that student-patients refused to be seen by Dr. Tyndall based upon his examination conduct. *Id.*

52.  Ms. Gilbert wrote that although management had knowledge of

11

1    complaints about Dr. Tyndall's conduct, USC had done nothing.  In June 2016 Ms.

2    Gilbert elevated her concerns outside the student health center to the Executive

3    Director of USC's Relationship and Sexual Violence and Prevention Services.  *Id.* at

4    Dkt. 143-10, pp. 9-11.

5        53.    As a result of Ms. Gilbert's reporting, the USC OED opened an

6    investigation into Dr. Tyndall in June 2016.

7        54.    During OED interviews, staff reported numerous allegations about Dr.

8    Tyndall's conduct during gynecological examinations.  *Id.* at Dkt. 143-13, pp. 5-15.

9        55.    Following the discovery of the hundreds of photographs and slides in Dr.

10    Tyndall's office, the Student Health Center's Interim Executive Director notified

11    Dr. Tyndall that he had violated staff bylaws, policies and procedures.  *Id.* at 19-21.

12    USC placed Dr. Tyndall on paid administrative leave while continuing its internal

13    investigation.  *Id.* at 23.

14        56.    During the OED's 2016 investigation, USC also retained two criminal

15    law experts to evaluate whether Dr. Tyndall's conduct constituted a crime.

16        57.    Additionally, the USC Student Health Center's co-directors retained a

17    third-party medical review company, MDReview, to examine and evaluate Dr.

18    Tyndall's clinical practices in light of his explanations.

19        58.    MDReview issued its report in November 2016.  A true and correct copy

20    of the report is attached as Exhibit E.

21        59.    MDReview concluded that several of Dr. Tyndall's practices were not

22    "within current standard of care" and that he "repeatedly exhibits behavior that is

23    unprofessional, inappropriate, and/or unusual."  The report concluded "a number of

24    significant concerns exist that would raise serious questions about patient physical

25    and psychological safety were Dr. Tyndall to return to practice," including "using

26    physical techniques that vary from standard accepted practices and could be, and

27    likely were…considered to represent inappropriate physical contact with patients that

28    would likely be considered serious boundary violations by a professional conduct,

licensing or credentialing committee." *Id.*

60.     On January 31, 2017, two months after the MDReview report, the OED issued its reports which concluded that Dr. Tyndall violated USC's policies on sexual and race harassment.  USC did not release or disclose the OED's findings or conclusion to the public, the complainants, or USC's insurers.  Dr. Tyndall remained on administrative leave and USC informed Dr. Tyndall of the plan to terminate his employment in May 2017.

61.     USC has stated that "[a]t the conclusion of the investigation by OED and Compliance in 2017, the university began termination proceedings." *See* "Summary of Coordinated Investigation of Student Health Physician," available at https://pressroom.usc.edu/files/2018/05/Summary-fact-sheet_5.15.18.pdf.

62.     Pursuant to the severance agreement, Dr. Tyndall's termination was effective as of June 30, 2017.  This was one day before the inception of the NACIC Policy under which USC has submitted a Claim to NACIC arising from Dr. Tyndall's conduct.  USC did not disclose Dr. Tyndall's termination, let alone the reasons for it, to the public, the claimants, or its insurers.

63.     Before the NACIC Policy's inception date, USC had knowledge of all these concerning allegations, complaints, facts, findings, and conclusions that subsequently formed the basis of the claims in the Federal Class Action and State Cases for which USC sought coverage.

64.     In early 2018, before the USC press releases and the *Los Angeles Times* story, Dr. Tyndall sought reinstatement to USC.  This prompted USC to file a formal complaint with the Medical Board of California that Dr. Tyndall engaged in unprofessional conduct.

65.     USC's then-President acknowledged that Dr Tyndall "should have been removed and referred to authorities years ago."[4]

_____

[4]     Letter from President Nikias to the USC Community, May 18, 2018, available at

**D.    Subsequent Developments Following the LA Times Story and USC's Public Statements.**

66.    Shortly after the *Los Angeles Times* story and USC's initial public statements, the U.S. Department of Education Office for Civil Rights ("OCR") opened an investigation of USC in connection with USC's handling of allegations and reports concerning Dr. Tyndall.

67.    The OCR issued its Letter of Finding to USC on February 27, 2020 (the "OCR Report") which contained additional information concerning USC's knowledge and about the OED investigations.  A true and correct copy of the OCR Report is attached hereto as Exhibit F.

68.    The OCR Report documented that in March or April 2016, USC's Nursing Supervisor informed the Student Health Center's Quality Manager that Dr. Tyndall was "**taking advantage, in a sexual way, of the students**." *Id.* at p. 20 (emphasis added).    The Quality Manager proceeded to have at least three conversations over the subsequent months with someone in OED, but she felt that she was not being heard and that OED's response was unsatisfactory.  *Id.* at p. 21.

69.    Evidence obtained by the OCR demonstrated that USC's Office of General Counsel coordinated the 2016 investigations into Dr. Tyndall.  *Id.* at p. 22.

70.    The OCR Report concluded USC had notice of possible sexual harassment[5] by Dr. Tyndall since at least 2000.

71.    The Los Angeles Police Department also opened an investigation into Dr. Tyndall following the *Los Angeles Times* story.

72.    During a search of Dr. Tyndall's personal storage unit, police discovered

---

https://pressroom.usc.edu/letter-from-president-nikias-to-the-usc-community-may-18-2018/ .

[5]    The OCR Report used the term "sexual harassment" in classifying Dr. Tyndall's conduct for purposes of Title IX

14

hundreds of photographs of unclothed women, including some taken in a medical examination room.  On June 26, 2019, the Los Angeles County District Attorney's Office filed 29 felony counts of sexual assault against Dr. Tyndall.  The counts involved 16 patients between 2009 and 2016.  In July 2020, the Los Angeles County District Attorney filed an additional 6 counts of sexual assault involving 5 additional victims between 2011 and 2015.

73.    USC released a 2019 Annual Security and Fire Report pursuant to the requirements of the Clery Act in October 2019 and subsequently updated it in 2020 where USC attributed 100 reportable incidents of rape and 16 reportable incidents of fondling to Dr. Tyndall.[6]

## V.    The Policies

### A.    The NACIC Policy

74.    USC through its broker requested that NACIC provide a quote for excess healthcare liability coverage for the policy period July 1, 2017 to July 1, 2018.

75.    NACIC provided a quote for the potential policy that included a section entitled "Special Conditions" which contained the following language:

**A.  BASIS OF COVERAGE.**  This Coverage is based on the underwriting information provided to the Insurer.

**B.  DUTY OF DISCLOSURE; DISCLAIMERS THEREOF VOID**.  This Coverage is provided on the basis that all information given to Insurer by or on behalf of the Insured in its underwriting submission and/or in its responses to the underwriter's requests for information is reliable, truthful, and complete to the best of the Insured's information and knowledge.  The Insurer relies on the

---

[6]    USC's 2019 Annual Security and Fire Safety Report, updated October 15, 2020, available  at  https://dps.usc.edu/files/2020/10/Updated-ASR-2019-10.13.2020-MW-Final.pdf , p. 98.

"duty of disclosure" as it exists under applicable law, and rejects any
attempt to negate that duty wholly or partially.

The Insured, by accepting this Coverage, waives the effect of any
purported disclaimers of the Insured's duty to disclose to
underwriters all material facts to the best of its knowledge that may
be contained in such submission or in its responses to questions or
requests for information, or in emails, cd roms, or internet websites
used in providing or transmitting underwriting information.

(A true and correct copy of the renewal quote with premium redacted is included in
the attached Exhibit G).

76.    Upon USC's acceptance of the quote, NACIC bound the policy and
issued a binder to USC which contained the same language as referenced in the quote.
(A true and correct copy of the binder with premium redacted is included in the
attached Exhibit H).

77.    NACIC issued USC a Healthcare Follow Form Excess Liability
Insurance Policy with limits of $20 million per loss and $20 million in the aggregate
for the policy period of July 1, 2017 to July 1, 2018.

78.    The NACIC Policy's $20 million in indemnity coverage is excess of $40
million in underlying coverage provided by BETARMA ($20 million per claim/$30
million aggregate) and National Fire & Marine Insurance Company ($20 million per
claim and in the aggregate).

79.    The NACIC Policy's Insuring Agreement provides "In consideration of
the payment of premium, and in reliance upon all statements made and information
furnished to us and subject to all the terms hereinafter provided…" which is followed
by, in part under Section I, titled "Coverage", the following:

(a)    We shall pay the amounts incurred by the **Insured** that
qualify as **Loss** in excess of the limit of liability of **Underlying
Insurance,** subject to the **Limits of Insurance** as provided
below. Liability under this policy with respect to any occurrence,

loss or claim shall not attach unless and until the limit of liability of **Underlying Insurance** has been exhausted by the actual payment of **Loss**.

If any **Underlying Insurance** excludes or otherwise does not cover an occurrence, loss or claim (for reasons other than exhaustion of the applicable aggregate limits of liability by actual payment of **Loss),** then this policy shall not cover such occurrence, loss or claim.

(Ex. A, Section I Coverage (a), p. 7.)

80.    The NACIC Policy contains the following definitions for the terms used in the Section I Coverage:

(i)    Followed Policy is defined as "the policy of insurance identified as such in the Declarations."

(ii)    Insured is defined as "any person or organization qualifying as such under the **Followed Policy.**"

(iii)    Loss "means the total amount which the **Insured** has become legally liable to pay as damages by reason of settlement, judgment or binding arbitration, which is, or but for the amount thereof would be, covered under this policy less any salvages or recoveries…."

(iv)    Underlying Insurance is defined as "the policies of insurance listed in, or which in fact should have been listed in, the Schedule of Underlying Insurance (including the **Followed Policy). Underlying Insurance** shall also include any self insurance listed in the Schedule of Underlying Insurance and the **Maintenance Retention."**

(v)    Limits of Insurance "means the amount of the applicable **Limit** or **Limits of Insurance** shown in the Declarations and as provided in Section II hereof."

(vi)    Medical Incident "shall have the same meaning of such term in the **Followed Policy** or the equivalent term used in the **Followed Policy** to

denote the occurrence or event from which a claim covered by the **Followed Policy** may arise."

(Ex. A, Section IV Definitions and Conforming of Terms (d), (g)-(i), (k) and (q), p. 11-12).

81.    The NACIC Policy includes a "Prior Known Acts Exclusion" which provides:

> This policy does not apply to any actual or alleged injury, damage, payment, or liability, loss, cost or expense arising out of or relating to any **Medical Incident** that was known by any of your below listed officers or employees, or was first reported to any insurer, prior to the first effective date of continuous coverage provided by the Insurer or any past, present or future affiliate or associate company of the Insurer:
>
> Any person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document; your internal legal counsel; your risk manager (or person in the equivalent position); any of your employees responsible for monitoring or managing medical incidents or occurrences under the risk manager's direction.

(Ex. A, Section III Exclusions (f), p. 10-11).

82.    Additionally, the NACIC Policy contains certain conditions under Section V, titled "General Conditions".

83.    One such general condition is "Duties in the Event of an Occurrence, Claim or Suit" which provides in part, the following:

(1)    **Conditions**

The **Insured** shall comply with the requirements set forth in paragraphs (A) and (B) below.

**(A)    Occurrences, Losses, and Claims Requiring Notice**

> As soon as reasonably practicable after the **Insured** becomes aware of any occurrence, loss or claim which, in the **Insured's** reasonable judgment, is likely to involve this policy, the **Insured** shall notify us of such occurrence,

loss or claim in writing at the address stated in the Declarations.

\*                    \*                    \*

(2)    **Defense Obligations**

We shall have the right and duty to defend the **Insured** against any suit seeking damages under this policy after the limit of liability of the **Underlying Insurance** has been exhausted by the actual payment of **Loss.** It is agreed that this duty to defend will only commence when the limit of liability of the **Underlying Insurance** has been exhausted by actual payment of **Loss.** We will have no duty to defend the **Insured** against any suit seeking damages to which this insurance does not apply….

(Ex. A, Section V General Conditions (a)(1)(A) and (a)(2), p. 12-13.)

84.    "Other Insurance" is another condition contained in the NACIC Policy which provides:

This insurance is excess over any valid and collectible other insurance available to the **Insured** whether primary, excess, contingent or any other basis, except other insurance written specifically to apply on a proportional basis to the **Limits of Insurance.** This provision shall not apply to other insurance written specifically to be excess over this policy.

(Ex. A, Section V General Conditions (3)(g), p. 14.)

85.    The NACIC Policy contains "follow form" language which provides:

This policy is subject to provisions, terms, conditions, exclusions and endorsements of the **Followed Policy**, except as provided otherwise by the **Limits of Insurance,** General Conditions, and other terms and exclusions of this policy, including any **Attached Endorsements**. If the **Followed Policy** applies on the basis of an occurrence, claim (first) made, occurrence notified, or other trigger of insurance limits, then this policy shall apply on the same basis.

(Ex. A, Section I Coverage (b), p. 7.)

**B.** **The BETARMA Policy**

86.    The underlying BETARMA Policy is a claims made and reported healthcare entity comprehensive liability contract.

87.    Section 2.1 of the BETARMA Policy regarding Healthcare Entity Professional Liability provides in part the following language:

1.    BETARMA will pay those sums which the **Member** is legally required to pay as damages for a **Claim** for **Bodily Injury**, **Property Damage** or **Economic Damages** arising out of the **Member's** negligence in the rendering of, or failure to render, **Professional Services**:

   A.    on or after the **Retroactive Date**; and

   B.    at a **Covered Location**; and provided that

   C.    the **Claim** is first made against the **Member** during the **Contract Period** and is reported in writing to BETARMA as soon as possible during the **Contract Period** but in no event later than thirty (30) calendar days after termination of the **Contract Period**.

2.    BETARMA will pay those sums which the **Member** is legally required to pay as damages for a **Claim** arising from a negligent act, error or omission resulting in actual or alleged denial, suspension, revocation, termination or limitation of medical staff privileges, provided that the effective date of the first denial, suspension, revocation, termination or limitation of staff privileges that is a basis of the **Claimant's Claim** occurs on or after the **Retroactive Date.** This coverage applies only if the **Claim** is first made against the **Member** during the **Contract Period** and is reported in writing to BETARMA as soon as possible during the **Contract Period** but in no event later than thirty (30) calendar days after termination of the **Contract Period**. BETARMA will defend, but will not indemnity, a **Claim** that is otherwise covered under this Section, but alleges an intentional act, error or omission.

*          *          *

20

4. BETARMA will pay those sums which the **Member** is legally required to pay as damages for a **Claim** arising out of the following offenses:

    A. discrimination based upon, without limitation, an individual's race, ethnicity, ancestry, national origin, citizenship, religion, age, sex, sexual orientation or preference, pregnancy, preexisting medical condition, physical or mental disability or handicap, insurance status, economic status or ability to pay for medical services, and

    B. sexual abuse, assault, battery, harassment or molestation

    if the **Claimant's** injury arises out of the **Member's** negligence in rendering of, or failure to render, **Professional Services** on or after the **Retroactive Date**; and at a **Covered Location**; and provided that the **Claim** is first made against the **Member** during the **Contract Period** but in no event later than thirty (30) calendar days after termination of the **Contract Period**.
BETARMA will defend, but will not indemnify, a **Claim** that is otherwise covered under this Section, but alleges an intentional act or omission.

88. The BETARMA Policy defines "**Bodily Injury**" as follows[7]:

**Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. **Bodily injury** includes mental anguish, mental injury or shock sustained by that person as a result of such bodily injury, sickness or disease.

For purposes of Section 2 [Healthcare Entity Professional Liability] only, **Bodily Injury** includes a bystander's mental anguish, mental injury, shock, fright or death resulting from physical injury, sickness or disease of another.

---

[7] Bolded terms not herein defined are otherwise defined within Section 1 of the BETARMA Policy.

(Ex. B. Section 1 Definitions 3, p. 5.)

89.    The BETARMA Policy defines "**Claim**" in part, as follows:

A. A written demand for damages, including:

(1) service of suit or institution of arbitration proceedings against a **Member**; or

(2) a demand made under an applicable claim statute, signed by or on behalf of one alleged to have been damaged by a **Member.**

\*                    \*                    \*

Two or more **Claims** arising out of a single **Occurrence** or an act, error, omission or offense or a series of relates **Occurrences,** acts, errors, omissions or offenses shall be treated as a single **Claim**. **Occurrences**, acts, errors, omissions and offenses are related if they share a causal connection or have ass a common nexus any event or transaction or series of events or transactions.  When two or more **Claims** are treated as a single **Claim**, the single **Claim** shall be considered first made when the earliest of the **Claims** is first made.

However, no **Claim** shall be deemed first made during the **Contract Period** if:

C. the **Claim** or incident was reported before the Effective Date of this Contract to BETARMA or to any liability insurer; or

D. any **Member** had knowledge prior to the Effective Date of facts or circumstances that would cause a reasonable person to believe that a **Claim** might be made.

(Ex. B. Section 1 Definitions 5, p. 5-6.)

90.    The BETARMA Policy defines "**Member"** as "a person or entity identified in Section 7.1 or to whom coverage is extended under Section 7.2."  (Ex. B. Section 1 Definitions 15, p. 7.).

91.    Section 7.1 of the BETARMA Policy provides that **Member**, in part, refers to USC, any medical director when performing administrative duties, and any

physician employed or contracted to provide **Professional Services** by USC, and those who previously qualified as a Member for Claims occurring prior to their termination of the relationship "but only with respect to his or her legal liability when acting within the course and scope of his or her duties" to USC and only to the extent that USC "is permitted or required by law to indemnify him or her."  Member also includes any USC employee other than a physician, surgeon, dentist, physician assistant, nurse anesthetist, nurse practitioner or nurse midwife.  (Ex. B, Section 7 Provisions Applicable to All Coverages, as amended by Amendment H310-01, pp. 23-24, 179.)

92.    The BETARMA Policy defines "**Professional Services**", in part, to mean: "medical, surgical, dental or nursing or other healthcare services or treatment to a patient, including custodial care and the furnishing of food or beverages in connection with the treatment" and "the furnishing or dispensing of drugs, or medical, dental or surgical supplies or appliances to a patient if the injury occurs after the **Member** has relinquished possession thereof."  (Ex. B. Section 1 Definitions 28, as amended by Amendment H336-01, pp. 9, 191.)

93.    BETARMA Policy's Section 2 coverage granting language states it is "subject to the exclusions in Section 6 and the total BETARMA will pay in Section 7." (Ex. B. Section 2 Healthcare Entity Professional Liability, p. 11.)

94.    The BETARMA Policy provides numerous applicable coverage exclusions concerning the claims set forth in the State Cases and settled in the Federal Class Action.

95.    BETARMA Policy Section 6- Exclusions provides:

**WHAT BETARMA WILL NOT COVER:**

**EXCEPT AS OTHERWISE PROVIDED BELOW, THESE EXCLUSIONS APPLY REGARDLESS OF WHETHER ANY OTHER CAUSE, ACT, ERROR, OMISSION, EVENT, MATERIAL OR PRODUCT CONTRIBUTES CONCURRENTLY OR IN ANY SEQUENCE TO A**

**CLAIMANT'S INJURY OR DAMAGE.**

(Ex. B, Section 6 Exclusions, p. 16.)

96.    Exclusion 5 of the BETARMA Policy states in relevant part that the BETARMA Policy "does not apply to any injury that is expected or intended by the **Member**."

(Ex. B. Section 6 Exclusions 5, p. 16.)

97.    BETARMA Policy Exclusion 6 states: "Except for the defense of criminal charges as provided in Section 2.6, this Contract does not apply to any **Claim** arising from or brought about or contributed to by the **Member's** dishonest, fraudulent, criminal or malicious acts or omissions, or to acts or omissions that an insurer could not indemnify under California Insurance Code Section 533." (Ex. B. Section 6 Exclusions 6, p. 16.)

98.    BETARMA Policy Exclusion 9 provides the BETARMA Policy:

> The [BETARMA Policy] does not apply to any **Claim** based, in whole or in part or directly or indirectly, on, attributable to, arising out of, resulting from, or in any way related to any actual or alleged violation of any federal, state or other statutory or common law (including but not limited to the Cartwright Act, California Business & Professions Code § 16600, et. seq., the Unfair Practices Act, Business & Professions Code § 17000, et. seq. and the Unfair Competition Act of the State of California, Business & Professions Code §§ 17200, et. seq. and 17500, et. seq. and Title 15 of the United States Code, all as they may be amended from time to time) that prohibits the unlawful restraint of trade, business or profession, <u>except</u> any liability arising from actions brought against the **Member** by any person or persons alleging the improper or unlawful denial or restriction of medical staff privileges or alleging the **Member's** failure to act upon any application for such privileges.

(Ex. B. Section 6 Exclusions 9, p. 17)(emphasis in original).

99.    BETARMA Policy Exclusion 12 excludes coverage for "any punitive or exemplary damages, fines, penalties, taxes, trebled damages or any other measure of damages exceeding actual compensatory damages." (Ex. B. Section 6 Exclusions 12,

p. 17.)

100.   BETARMA Policy Exclusion 16 states: "BETARMA will not pay for equitable remedies or the costs of complying with equitable remedies, governmental requests, directives, orders or recommendations.  (Examples of equitable remedies include injunctions, restitution, disgorgement, declaratory relief, constructive trust, and rescission, reformation or specific performance of a contract.)" (Ex. B. Section 6 Exclusions 16, p. 18-19.)

101.   BETARMA Policy Exclusion 24 provides that the BETARMA Policy "does not apply to any damages directly or indirectly arising out of, resulting from or in any way related to any **Privacy Breach Wrongful Act**." (Ex. B. Section 6 Exclusions 24, p. 20.)

102.   Privacy Breach Wrongful Act is defined under the BETARMA Policy as meaning: "(a) any actual or alleged failure to safeguard or to prevent unauthorized access to or use or disclosure of any **Personal Information**, including any access, use or disclosure that exceeds authorization, (b) failure to give notification of any actual or potential unauthorized access to, or use or disclosure of, any **Personal Information**."  (Ex. B, Section 1 Definitions 26, p. 9.)

103.   The BETARMA Policy defines "**Personal Information**" to include "any information defined as 'individually identifiable health information,' 'medical information', 'personal information' or 'personally identifying information' in the Health Insurance Portability and Accountability Act of 1996 or the California Civil Code, as amended from time to time, or in any regulations adopted thereunder."  (Ex. B, Section 1 Definitions 23, p. 8.)

104.   In addition to the numerous applicable exclusions in the BETARMA Policy, it contains other applicable conditions and terms applicable to the coverage issues presented in the present action under Section 7 Provisions Applicable to All Coverages ("BETARMA Policy Condition").

105.   BETARMA Policy Condition 9.B states in part: "(2) If BETARMA pays

any amount in settlement or satisfaction of any **Claim** … for which BET**ARMA** has no liability under this Contract, the **Member** shall reimburse BET**ARMA** for such amounts within thirty (30) calendar days of BET**ARMA**'S request."

(Ex. B, Section 7 Provisions Applicable to All Coverages 9.B(2), p. 28.)

106. BET**ARMA** Policy Condition 14.B (The Protection Afforded Under This Contract is Excess Protection for Certain Members) states:

> With respect to the **Named Member**…and the persons identified in Sections 7.1.A(1) and 7.1.A(6)(a), this Contract shall be excess of any valid and collectible insurance or other coverage or self-insurance obtained or maintained by the **Member** or for the **Member's** benefit, whether such coverage or insurance or self-insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such coverage or insurance or self-insurance is written only as specific excess coverage, insurance or self-insurance over and above the Limit of Liability provided under this Contract by reference to the Certificate number of this Contract.

(Ex. B, Section 7 Provisions Applicable to All Coverages 14.B, p. 32.)

## COUNT I

## DECLARATORY JUDGMENT

### (Claim First Made Before Policy Period and Not Reported)

### (Against All Defendants)

107. NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

108. An actual controversy exists between NACIC and USC and Dr. Tyndall about whether (a) NACIC is or was obligated to indemnify USC and/or Dr. Tyndall in the Federal Class Action for the Federal Settlement and (b) NACIC is or was obligated to defend or indemnify USC and/or Dr. Tyndall in the State-Court Actions.

109. As a result of this controversy and pursuant to 28 U.S.C. §§ 2201 and 2202, NACIC seeks a judicial determination of the rights and duties of the parties under the NACIC Policy and the BET**ARMA** Policy to which the NACIC Policy generally follows form.

110. The BETARMA Policy requires Claims to be first made and reported during the policy period. However, a Claim is ***not*** deemed to be first made during the policy period if "any **Member** had knowledge prior to [July 1, 2017] of facts or circumstances that would cause a reasonable person to believe that a **Claim** might be made." (Ex. B, p. 5-6)

111. The Claim submitted to NACIC arising from Dr. Tyndall's conduct is not deemed to be first made during the NACIC policy period of July 1, 2017 to July 1, 2018 because USC, Dr. Tyndall, the Trustees or any other individual meeting the BETARMA Policy's definition of **Member** had knowledge of facts or circumstances prior to July 1, 2017 that would cause a reasonable person to believe that a Claim might be made. By way of example, USC, Dr. Tyndall and numerous **Members** had knowledge of the following prior to July 1, 2017:

(i)     Numerous student and USC staff complaints concerning Dr. Tyndall's inappropriate conduct over many years;

(ii)    Nursing supervisor's report to the Student Health Center's Quality Manager in March or April 2016 that Dr. Tyndall was taking advantage of students sexually;

(iii)   USC conducted multiple investigations into Dr. Tyndall's inappropriate conduct;

(iv)    USC placed Dr. Tyndall on administrative leave;

(v)     USC's retained outside consultant's report that Dr. Tyndall's techniques represented inappropriate physical contact and that due to Dr. Tyndall's particularly vulnerable patient population, student-patients may have been less likely to submit complaints;

(vi)    USC consulted with multiple criminal law experts as to whether Dr. Tyndall's conduct constituted a crime;

(vii)   USC's OED's determination that Dr. Tyndall violated USC policies on racial discrimination and sexual harassment; and

(viii)  Dr. Tyndall's subsequent termination.

112.   USC and Dr. Tyndall had extensive knowledge of the facts and circumstances surrounding Dr. Tyndall's inappropriate and unprofessional behavior during visits and examinations with student-patients before July 1, 2017.

113.   The volume of facts and circumstances known to USC and Dr. Tyndall would cause a reasonable person to believe that a Claim might be made against USC, Dr. Tyndall and/or the Trustees before July 1, 2017.

114.   Those facts and circumstances formed the basis of the Federal Class Action and State Cases for which USC requested coverage during the NACIC Policy Period.

115.   Neither USC, USC's employees, USC's Trustees nor Dr. Tyndall reported the Claim, a potential Claim, or the facts or circumstances surrounding Dr. Tyndall's recurring conduct that could have led (and did lead) to a Claim, to NACIC before July 1, 2017.

116.   Because USC, Dr. Tyndall, the Trustees or any other individual meeting the BETARMA Policy's definition of **Member** had knowledge of facts or circumstances prior to July 1, 2017 that would cause a reasonable person to believe that a Claim might be made and the Claim was not reported to NACIC until after July 1, 2017, NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases because the Claim was not first made and reported to NACIC during the July 1, 2017 to July 1, 2018 policy period.

**COUNT II**

**DECLARATORY JUDGMENT**

**(California Insurance Code §533)**

**(Against All Defendants)**

117.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

118.   The BETARMA Policy includes an exclusion (Exclusion 6) that incorporates California Insurance Code Section 533 which states: "An insurer is not liable for a loss caused by the willful act of the insured…."  (Ex. B, p. 16).

119.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to  indemnify USC or Dr. Tyndall in the State Cases if and to the extent it is determined that the claimed damages arose from the insured's willful acts.

**COUNT III**

**DECLARATORY JUDGMENT**

**(Exclusion 6- Dishonest, Fraudulent, Criminal or Malicious Acts or Omissions)**

**(Against All Defendants)**

120.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

121.   The BETARMA Policy's Exclusion 6 excludes coverage for "any **Claim** arising from or brought about or contributed to by the **Member's** dishonest, fraudulent, criminal or malicious acts or omissions…."  (Ex. B, p. 16).

122.   The Federal Class Action and State Cases seek damages that arose from, were brought about, or contributed to by USC's dishonest, fraudulent, criminal or malicious acts or omissions.

123.   The Federal Class Action and State Cases seek damages that arose from,

were brought about, or contributed to by Dr. Tyndall's dishonest, fraudulent, criminal or malicious acts or omissions.

124.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases because the claimed damages arose from, were brought about, or contributed to by Dr. Tyndall and/or USC's dishonest, fraudulent, criminal or malicious acts or omissions.

**COUNT IV**

**DECLARATORY JUDGMENT**

**(Exclusion 5- Expected or Intended Injury)**

**(Against All Defendants)**

125.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

126.   The BETARMA Policy's Exclusion 5 excludes coverage for "any injury that is expected or intended by the **Member**."

127.   The injuries claimed in the Federal Class Action and State Cases were expected or intended by Dr. Tyndall and USC.

128.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases because the injuries claimed in the Federal Class Action and State Cases were expected or intended by Dr. Tyndall and USC.

**COUNT V**

**DECLARATORY JUDGMENT**

**(Acts Outside Course and Scope of Duties)**

**(Against All Defendants)**

129.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

130.   As a prerequisite to coverage, the BETARMA Policy limits individual coverage only to those "when acting within the course and scope of his or her duties to the **Named Member** or **Subsidiary**…." (Ex. B, p. 23).

131.   The alleged acts of Dr. Tyndall and the Trustees described in the Federal Class Action and State Cases were not within the course and scope of duties to USC.

132.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases to the extent Dr. Tyndall or the Trustees were not acting within the course and scope of their duties to USC.

**COUNT VI**

**DECLARATORY JUDGMENT**

**(Exclusion f- Prior Known Acts)**

**(Against All Defendants)**

133.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

134.   The NACIC Policy's Exclusion (f) (the Prior Known Acts Exclusion) excludes coverage for "any actual or alleged injury, damage, payment, or liability, loss, cost or expense arising out of or relating to any **Medical Incident** that was known…prior to the first effective date of continuous coverage provided by the Insurer…[by a]ny person holding any of the officer positions created by your charter,

constitution, by-laws or any other similar governing document; your internal legal counsel; your risk manager (or person in the equivalent position); any of your employees responsible for monitoring or managing medical incidents or occurrences under the risk manager's direction." (Ex. A, p. 10).

135.   Numerous qualifying individuals had prior knowledge of the alleged injuries, liabilities, and losses contained in the Federal Class Action and State Cases.

136.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases because qualifying individuals had prior knowledge of the injuries, liabilities, and losses claimed in the Federal Class Action and State Cases.

## COUNT VII
## DECLARATORY JUDGMENT
### (Exclusion 24- Privacy Breach Wrongful Act)
### (Against All Defendants)

137.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

138.   The BETARMA Policy's Exclusion 24 excludes coverage for "any damages directly or indirectly arising out of, resulting from or in any way related to any **Privacy Breach Wrongful Act**." (Ex. B, p. 20).

139.   Both the Federal Class Action and State Cases allege damages based on photographs taken by Dr. Tyndall of the student-patient's body and genitalia under the guise of providing medical services.  Further, USC and Dr. Tyndall did not properly safeguard the photographs or prevent unauthorized access:  Dr. Tyndall kept the photographs in his office and kept more at a personal storage facility.

140.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy

does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases for any damages arising out of, resulting from or any way relate to any **Privacy Breach Wrongful Act**.

**COUNT VIII**

**DECLARATORY JUDGMENT**

**(Exclusion 9- California Business and Professions Code)**

**(Against All Defendants)**

141.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

142.   The BETARMA Policy's Exclusion 9 excludes coverage for claims "based, in whole or in part or directly or indirectly, on, attributable to, arising out of, resulting from, or in any way related to any actual or alleged violation of … California Business and Professions Code §§ 17200, et. seq. and 17500, et. seq…." (Ex. B, p. 17).

143.   The State Cases include claims under California Business and Professions Code § 17200.

144.   NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases for any claim based, in whole or in part or directly or indirectly attributable to, arising out of, resulting from, or in any way related to any actual or alleged violation of California Business and Professions Code §§ 17200, et. seq.

**COUNT IX**

**DECLARATORY JUDGMENT**

**(Claimed Damages are Not Based on a "Member's negligence in the rendering of, or failure to render, Professional Services.")**

**(Against All Defendants)**

145.  NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

146.  The BETARMA Policy provides coverage for damages "arising out of the **Member's** negligence in the rendering of, or failure to render, **Professional Services**." (Ex. B, p. 11).

147.  The alleged damages in the State Cases and Federal Class Action concerning Dr. Tyndall and USC arose from Dr. Tyndall's criminal conduct—not **Professional Services** as defined in the BETARMA Policy.

148.  The State Cases and the Federal Class Action further allege that USC, Dr. Tyndall and the Trustees acted deliberately, intentionally, maliciously, recklessly, and wantonly such that their conduct surpassed negligence.

149.  Therefore, NACIC is entitled to a judgment declaring that (i) the NACIC Policy does not afford USC coverage for the Federal Class Action or State Cases, (ii) NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action under the NACIC Policy, and (iii) NACIC does not have a duty under the NACIC Policy to defend or indemnify USC or Dr. Tyndall in the State Cases because the claimed damages did not arise "out of the **Member's** negligence in the rendering of, or failure to render, **Professional Services**.".

**COUNT X**

**DECLARATORY JUDGMENT**

**(Federal Class Action and State Cases Constitute a Single Claim)**

**(Against All Defendants)**

150.  NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

151.    The BETARMA Policy states "[t]wo or more **Claims** arising out of … an act, error, omission or offense or a series of related … acts, errors, omissions or offenses shall be treated as a single **Claim**."  (Ex. B, p. 6).  It further provides that "acts, errors, omissions and offenses are related if they share a causal connection or have as a common nexus any event or transaction or series of events or transactions." (*Id.*)

152.    The Federal Class Action and State Cases allege a historical pattern of conduct by Dr. Tyndall and USC and claimed injuries by the plaintiffs, *i.e.,* a series of acts, errors, omissions, or offenses sharing a causal connection or have a common nexus of events.

153.    NACIC is entitled to a judgment declaring that the claims set forth in the Federal Class Action and States Cases constitute a single Claim under the BETARMA Policy.

## COUNT XI

## DECLARATORY JUDGMENT

## (Underlying Insurance Not Exhausted)

## (Against All Defendants)

154.    NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

155.    NACIC's Policy applies only to a qualified "**Loss** in excess of the limit of liability of **Underlying Insurance**, subject to the **Limits of Insurance**…. Liability under this policy with respect to any occurrence, loss or claim shall not attach unless and until the limit of liability of **Underlying Insurance** has been exhausted by the actual payment of **Loss**."  (Ex. A, p. 7).

156.    Since the claims in the Federal Class Action and State Cases do not constitute covered claims under either the NACIC Policy or the BETARMA Policy, neither BETARMA nor MedPro's payments to USC towards the settlement of the Federal Class Action exhausted USC's policy limits.

157.   Since USC has not exhausted the applicable limits of its underlying insurance, NACIC is entitled to a judgment declaring that the underlying limits of insurance have not been exhausted by actual payment of loss and as a result, the NACIC Policy does not attach.

**COUNT XII**

**DECLARATORY JUDGMENT**

**(Tier 1 Payments Do Not Constitute Claims for Damages, Loss or Injury)**

**(Against All Defendants)**

158.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

159.   The BETARMA Policy states that it "will pay those sums… as damages for a **Claim** for **Bodily Injury**, **Property Damage** or **Economic Damages** arising out of the **Member's** negligence in the rendering of, or failure to render, **Professional Services….**" (Ex. B, p. 11).  Also, that it "will pay those sums which the **Member** is legally required to pay as damages for a **Claim** arising out of … discrimination, sexual abuse, assault, battery, harassment or molestation if the **Claimant's** injury arises out of the **Member's** negligence in the rendering of, or failure to render, **Professional Services**…." (Id.).

160.   Under the terms of the Federal Class Action Settlement Agreement, (a) USC, Dr. Tyndall and the Trustees were to deposit $50 million into an escrow account within 10 days after the time to appeal expired, which would be used towards the administration costs of the settlement, including the Special Master's team and panel, as well as Tier 1 claim awards and (b) the remaining settlement funds were not due at that time, instead the remaining funds were to be paid into the escrow account within 10 days after the Special Master submitted her proposed claim awards for the Tier 2 and Tier 3 claimants.

161.   The date to deposit the $50 million was April 6, 2020.  The Special Master submitted the proposed claim awards for Tier 2 and Tier 3 claimants on March

1  24, 2021 which set the second deposit date of April 3, 2021.  *See In re USC Student*
2  *Health Litigation*, 18-cv-04258, Dkt 179-1(C.D. Cal. Mar. 24, 2021).

3       162.   15,006 Tier 1 awards went out on April 6, 2020 totaling $37,515,000.
4  Additional Tier 1 awards were distributed in July 2020 through March 2021.

5       163.   The Federal Class Action settlement agreement did not require Tier 1
6  claimants to sustain any damages or injuries or to claim negligent rendering of
7  Professional Services.  Minimum Tier 1 qualifications for payment applied to "[a]ll
8  women seen for treatment by Dr. Tyndall at the USC student health center between
9  August 14, 1989 to June 21, 2016: (a) for Women's Health Issues…."  *In re USC*
10 *Student Health Litigation*, 18-cv-04258, Dkt 167-1, p. 14 (C.D. Cal. Jan. 13, 2020).

11      164.   Because the Tier 1 payments made in the Federal Class Action were not
12 for damages or bodily injury arising out of negligence in rendering of, or failing to
13 render, Professional Services by USC, Dr. Tyndall, or the Trustees, NACIC is entitled
14 to a judicial declaration that (1) it does not have a duty to indemnify USC, Dr. Tyndall
15 or the Trustees for those payments, (2) it did not have a duty to defend USC, Dr.
16 Tyndall or the Trustees for the period of March 27, 2020 to May 7, 2020, and (3) it is
17 entitled to reimbursement of the defense expenses paid to USC for that period.

18      165.   In the alternative, since the initial Tier 1 payments on April 6, 2020
19 totaled $37,515,000 and thus did not exhaust the $40 million in underlying insurance
20 and the next round of Tier 1 payments did not occur until July 2020 (after NACIC
21 tendered its indemnity payment subject to a reservation of rights), NACIC is entitled
22 to a judicial declaration that (1) it did not have a duty to defend USC, Dr. Tyndall or
23 the Trustees from March 27, 2020 to May 7, 2020 and (2) it is entitled to
24 reimbursement of the defense expenses paid to USC for that period.

25
26
27
28                                **COUNT XIII**

**DECLARATORY JUDGMENT**

**(Exclusion 12- Punitive, Exemplary, or Other Non-Compensatory Damages)**

**(Against All Defendants)**

166.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

167.   The BETARMA Policy's Exclusion 12 excludes coverage for "any punitive or exemplary damages, fines, penalties, taxes, trebled damages or any other of measure of damages exceeding actual compensatory damages." California public policy also prohibits indemnification of punitive damages. (Ex. B., 17).

168.   The Federal Class Action and State Cases sought punitive damages against USC, Dr. Tyndall and/or the Trustees.

169.   Further, the payments to the Tier 1 claimants made in the Federal Class Action exceeded actual compensatory damages.

170.   NACIC is entitled to a judgment declaring that NACIC does not have a duty to indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action or the State Cases for any punitive damages, exemplary damages, fines, penalties, taxes trebled damages or any other measure of damages exceeding actual compensatory damages pursuant to the NACIC Policy and California public policy (as to punitive damages).

**COUNT XIV**

**DECLARATORY JUDGMENT**

**(Exclusion 16- Equitable Remedies)**

**(Against All Defendants)**

171.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

172.   The BETARMA Policy's Exclusion 16 excludes coverage for "equitable remedies or the costs of complying with equitable remedies…." (Ex. B, 18-19).

173.   Both the Federal Class Action and State Cases sought forms of equitable

relief.

174.  The Federal Class Action Settlement included forms of equitable relief and included administrative expenses for complying with those equitable relief.

175.  NACIC is entitled to a judgment declaring that NACIC does not have a duty to indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action or the State Cases for any equitable relief or the costs of complying with equitable remedies.

## COUNT XV
## DECLARATORY JUDGMENT
### (NACIC Policy is Excess of Other Insurance)
### (Against All Defendants)

176.  NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

177.  The NACIC Policy states "[t]his insurance is excess over any valid and collectible other insurance available to the **Insured** whether primary, excess, contingent or any other basis…."  (Ex. A, p. 14).

178.   The BETARMA Policy provides it "shall be excess of any valid and collectible insurance or other coverage or self-insurance obtained or maintained by the **Member** or for the **Member's** benefit, whether such coverage or insurance or self-insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other coverage or insurance or self-insurance is written only as specific excess coverage, insurance or self-insurance over and above the Limit of Liability provided under this Contract by reference to the Certificate number of this Contract." (Ex. B, p. 32).

179.  NACIC, to the extent that USC, Dr. Tyndall or the Trustees have other non-exhausted insurance coverage or self-insurance, is entitled to a judgment declaring that NACIC does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees in the Federal Class Action or State Cases.

## COUNT XVI

**REIMBURSEMENT**

**(Against All Defendants)**

180.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

181.   Subject to a full reservation of rights under the policies and California law, NACIC paid USC an indemnity payment of its full $20 million policy limits and also paid USC for an agreed amount for defense expenses from March 24, 2020 through May 7, 2020.

182.   Due to the coverage defenses specified above, NACIC has no defense or indemnity obligations under the NACIC Policy for the Federal Class Action or State Cases and is therefore entitled to reimbursement of its $20 million indemnity payment and its defense expense payment.

**COUNT XVII**

**REIMBURSEMENT OF DEFENSE EXPENSES (IN THE ALTERNATIVE)**

**(Against All Defendants)**

183.   NACIC incorporates by reference each allegation contained in the foregoing Paragraphs of this Complaint.

184.   In the alternative to the relief sought under Count XVI, NACIC is entitled to reimbursement of the defense expense payments it made from March 24, 2020 through May 7, 2020 because the Tier 1 claim awards did not constitute payment for a loss, injury or damage as required under the NACIC and BETA Policies.

185.   Since the Tier 1 claim award payments did not constitute a payment for a loss, injury or damage, payments for the Tier 1 claim awards do not constitute an exhaustion of the underlying policies.

186.   Due to the coverage defenses specified above, NACIC had no defense obligations under the NACIC Policy for the Federal Class Action or State Cases between March 24, 2020 and May 7, 2020 and is therefore entitled to reimbursement of its defense expense payment.

## COUNT XVIII

## RESCISSION (IN THE ALTERNATIVE)

## (AGAINST ALL DEFENDANTS)

187.  NACIC incorporates the allegations of the foregoing Paragraphs of this Complaint.

188.  Pursuant to California Insurance Code Section 332, "[e]ach party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

189.  A party's "[n]eglect to communicate that which a party knows, and ought to communicate is concealment" which "[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance."  Cal. Ins. Code §§ 330, 331.

190.  NACIC's renewal quote and binder to USC included the following special condition:

> **B. DUTY OF DISCLOSURE; DISCLAIMERS THEREOF VOID.**  This Coverage is provided on the basis that all information given to Insurer by or on behalf of the Insured in its underwriting submission and/or in its responses to the underwriter's requests for information is reliable, truthful, and complete to the best of the Insured's information and knowledge. The Insurer relies on the "duty of disclosure" as it exists under applicable law, and rejects any attempt to negate that duty wholly or partially.
>
> The Insured, by accepting this Coverage, waives the effect of any purported disclaimers of the Insured's duty to disclose to underwriters all material facts to the best of its knowledge that may be contained in such submission or in its responses to

1             questions or requests for information, or in emails cd roms, or

2             internet websites used in providing or transmitting underwriting

3             information.

4       191.   The NACIC Policy was issued "in reliance upon all statements made and

5 information furnished to [NACIC]."

6       192.   Additionally, the BETARMA Policy includes a condition that "[a]ll

7 **Members** represent that the statements contained in the application, any updated or

8 supplementary application and all materials submitted to BETARMA in connection

9 with an application, are true, accurate and complete." The condition goes on to state

10 that "[a]ll **Members** agree that" the statements are material to the acceptance of the

11 BETARMA Policy and it "is issued in reliance upon the truth, accuracy and

12 completeness of those statements."

13       193.   Therefore, USC had a duty under the NACIC Policy, BETARMA Policy,

14 and the California Insurance Code to disclose or communicate all known facts that

15 were material to the NACIC Policy before NACIC issued it.

16       194.   USC had substantial knowledge of events, reports, complaints, and the

17 investigation findings concerning the allegations against Dr. Tyndall before applying

18 for the NACIC Policy, as alleged above. In fact, USC had already informed Dr.

19 Tyndall that he was being terminated before USC's broker requested NACIC to bind

20 coverage for the NACIC Policy. On information and belief, at all times relevant

21 hereto, USC believed that if the allegations of improper medical care and of sexual

22 and racial harassment over multiple years were to be disclosed to the public that Dr.

23 Tyndall and USC would be sued by former patients. Despite USC's knowledge, USC

24 did not communicate or otherwise disclose the events, reports, complaints, and the

25 investigation findings concerning the allegations against Dr. Tyndall to NACIC or

26 any other of its insurers until after they became public almost a year into the July 1,

27 2017 to July 1, 2018 policy period.

28       195.   On information and belief, when USC applied for the NACIC Policy,

USC believed that the allegations against Dr. Tyndall were likely to result in claims against Dr. Tyndall and USC. USC gave sufficient credence to the allegations that on January 31, 2017, it found that Dr. Tyndall had violated USC's polices against sexual and racial harassment and in May 2017, it terminated his employment. USC knew that the allegations made against Dr. Tyndall would be material to all of the insurers to which USC applied for healthcare professional liability coverage, including NACIC. The allegations, complaints, investigations, and reports concerning Dr. Tyndall known to USC before it applied for the NACIC Policy were material to the risk that USC was asking NACIC to undertake in providing excess healthcare liability coverage.

196. In addition to the application materials, USC provided periodic reports of claims, losses, or incidents to NACIC and USC's other insurers (including reports of pending lawsuits, pre-lawsuit claims, or other incidents that may develop into a claim or lawsuit), without limiting the reports to incidents potentially involving damages in excess of primary coverage ("Periodic Reports"). Despite knowledge of the inappropriate and unprofessional behavior of Dr. Tyndall, and USC's practice of making Periodic Reports, USC did not include anything about the reports or allegations against Dr. Tyndall in the Periodic Reports provided to NACIC and USC's other insurers prior to issuance of the NACIC Policy.

197. USC knew these facts would be material to NACIC and its other insurers when applying for liability insurance, particularly in seeking a claims made and reported policy.

198. Instead of learning about the history of concerns and alarming allegations regarding Dr. Tyndall and the investigation findings concerning the allegations against Dr. Tyndall directly from its insured, USC, NACIC first learned about Dr. Tyndall's conduct and USC's knowledge after issuance of the NACIC Policy when USC demanded coverage under the NACIC Policy for the numerous lawsuits that followed.

199.   NACIC had no means of ascertaining these material facts and no reason to believe these material facts existed.  It relied on USC to disclose and communicate such material facts.  It relied on USC not to conceal such material facts.

200.   USC's failure to communicate or disclose these troubling allegations and investigation findings to NACIC resulted in NACIC issuing the NACIC Policy without knowledge of substantial material facts and allegations to take under consideration when determining the premiums, terms, conditions, and exclusions with respect to the NACIC Policy, or whether to issue the NACIC Policy at all.

201.   NACIC would not have issued the NACIC Policy on the same terms, conditions, and exclusions, or at all, had USC not concealed these material facts.

202.   The lack of transparency is further demonstrated by USC's press releases that occurred only after it learned that the Los Angeles Times was about to release its investigative article on long history of concerns and allegations involving Dr. Tyndall. Upon information and belief, USC concealed the allegations, complaints, investigations, and reports to prevent the likelihood of lawsuits and harm to its public image which also had the undeniable effect of deceiving its insurers, including NACIC.

203.   Pursuant to California law, NACIC is entitled to rescission of the NACIC Policy due to USC's concealment of facts material to the NACIC Policy.

204.   NACIC requests the Court, in the alternative to Count I-XVII, to grant NACIC's request that the NACIC Policy be rescinded.

WHEREFORE, NACIC respectfully requests this Court to:

a.   adjudicate and declare the rights and obligations of the parties hereto under the NACIC Policy, if any;

b.   Declare that NACIC did not and does not have a duty to defend or indemnify USC, Dr. Tyndall or the Trustees; or in the alternative, rescind the NACIC Policy;

c.   Order USC to reimburse NACIC for the indemnity payments

1   it made to USC under a reservation of rights;

2   d.   Order USC to reimburse NACIC for the defense payments it

3   made to USC under a reservation of rights;

4   e.   In the alternative to (b), (c) and (d) of this Prayer for Relief,

5   declare that:

6   (i) the claims set forth in the Federal Class Action and States Cases

7   constitute a single Claim under the BETArma Policy; and

8   (ii) NACIC does not have a duty to indemnify USC or Dr. Tyndall

9   for the Tier 1 Payments; or, in the alternative, NACIC did not have

10   a duty to defend USC or Dr. Tyndall from March 27, 2020 to May

11   7, 2020 and NACIC is entitled to reimbursement of the defense

12   expenses paid to USC for that period;

13   f.   Award NACIC experts' fees and costs of litigation;

14   g.   Award NACIC pre-judgment and post-judgment interest at the

15   lawful rate; and

16   h.   Award any and all such further relief as the Court deems

17   equitable and just, or that may be available.

18

19   DATED:  April 20, 2023   SEVERSON & WERSON
20   A Professional Corporation

21

22   By:   */s/ Michael B. Murphy*
23        MICHAEL B. MURPHY

24   Attorneys for Plaintiff NORTH AMERICAN
     CAPACITY INSURANCE COMPANY

25

26

27

28